We'll turn now to the argument calendar for merits cases. Our first case for today is Antonio Luna Garcia v. Garland, docket 20-1641. Understand that we have counsel for Mr. Luna Garcia present here today, and we will have counsel for the government arguing remotely. So let's see. Good morning, Ms. Andrade. Yes. So I understand you would like to reserve two minutes for rebuttal, is that right? Yes, Your Honor. That's correct. Very good. Feel free to proceed. Yes, Your Honor. On behalf of Mr. Garcia, Mr. Garcia had an immigration case. And I'm sorry, could I just ask you to please lower the microphone? That's perfect. Thank you. Mr. Garcia is... We have tech help here. Mr. Garcia is in the approval proceedings and he has a final order. We are here to ask the court to please remand his proceedings so that he can continue with his seeking of adjustment of status. He is eligible for a 6018. And because administrative closure was foreclosed by the matter of Castro-Tongue at the time that we did the hearing, that motion was denied by the judge. And I also request administrative closure again in front of the board. That again was denied based on Castro-Tongue. Recently on July 15, 2021, Attorney General Hartman has issued a new case, the matter of Cruz Valdez, and the matter of Cruz Valdez basically overturns Castro-Tongue. So we believe that this is a case that is right to be remanded back to the agency for the adjudication of... Well, before we get to the Castro-Tongue question, I mean, the BIA did not... The agency didn't just deny the request based on Castro-Tongue, but also said that your argument that you needed administrative closure in order to apply for a provisional unlawful presence waiver was not correct. That's correct. In your brief, you seem to acknowledge that you could still apply for the waiver if you filed an I-212, right, which is to get permission to reapply from USCIS. Yes. But you said that you can't do that because you don't have a final order of removal. Is that right? That's correct. I can see that. I can see that the 212 could have been filed. However... Go ahead. However, I believe that due process would require that in 2018, when that wasn't the law, and I filed for the administrative closure, and also before the BIA, that right now, based on the change in law, that I shouldn't have to choose between doing an I-212, which puts my clients in a precarious position because he would have to leave the country having had a removal order of an I-212. The safest way for my clients to leave the country, and I've done a lot of these cases, is to have the 6018. He goes outside the country because he entered illegally and then comes back in. So I don't think it should be... Wouldn't he have to do that to apply for adjustment of status anyway? He has to file the 6018 one. He has the approved petition that we had for a long time. So we're in a posture, compared to the other cases that have found administrative closure in the other circuits, where the I-130 is approved, we just need to have the administrative closure, which is required by the regulations. It's not something that we're... Well, I think you just said it's not required by the regulations. The regulations do require that the proceedings be closed at the time of the filing of the 6018. In our particular case, it was... It was a matter of, I believe, 40 days between us having our individual merits hearing and the practice of immigration court, and we prepare all documents within the deadline close to the hearing. So in the preparation of the case, part of our strategy of defending Mr. Garcia's rights was to also pursue the I-130 6018. When we got to court, right before we got to our hearing, we were... That was foreclosed by Castro-Tum. By the Attorney General issuing that decision, certifying... Right, I understand. But I guess what I was exploring was the agency said, even if we weren't constrained by Castro-Tum, we still think your argument that you need administrative closure is not correct, that you still could apply anyway. And in your briefing, you say you don't think it's right because to move forward in the final order of removal, which you say you don't have. But it sounds like now you're making a different argument. I concede. I concede that I was wrong on that. I see. Okay. I concede totally that I was wrong on that. However, in reviewing the whole case, and especially what's happened recently, I believe that I still have a right claim. It was raised at the lower court. It was again raised before the BIA. And at that point, you put my client, Mr. Garcia... What happened was you put the client in a position of, do I pursue my rights, which I'll have to pursue a position before the federal court, or do I forego that and pursue the Act 212? Well, do you have to choose between those? Couldn't you just do them in parallel? We could have done parallel. We didn't. And we believe that based on the whole... We have a situation with the regulation where two attorney generals are looking at the same statute and coming up with totally different views of it. Yeah. I guess... You want to be put in the same position that you would be in if Castro-Trump had not been decided? I'm sorry, Your Honor? You want to be put in the same position you would have if Castro-Trump had never been decided? That's absolutely correct. Castro-Trump had not come about. The reality of another practicing immigration over 20 years is that Mr. Garcia would have probably been a legal permanent resident already. So I guess I have two questions about that. So one is, if there never were a matter of Castro-Trump, why wouldn't we think that the agency still would have denied the request on its other ground, that it said it's not true that you need... I mean, you've conceded that you made an argument that's incorrect, which is that you needed a... I conceded that. But had there been no Castro-Trump, when we practice immigration law and the judges are very busy, the government lawyers are very busy, this is the type of case that I have without a doubt the belief that the administrative closures would have been granted. And why would it have been good for the government lawyer and the judge to grant it? Because it puts the case to the side. The case does not get lost in the limbo. We go to the agency. The agency processes this and so on. It sounds like you're just making the argument for administrative closure, but the agency said that they wouldn't give you administrative closure. When you say the agency, you mean the board and the... Yeah, right. The two judges. Because they couldn't. At the point where... Isn't your point that amnesty was not followed by the agency? Absolutely. And that you're entitled to have an agency go through that. Absolutely. I absolutely do. That is my position. So I guess that's my other question, which is, so as you said, different attorney generals had different interpretations of the statute. So we review decisions of the board for abuse of discretion. So if at the time the board was deciding the case, they interpreted the statutes not to authorize administrative closure, or the attorney general had directed the BIA not to grant administrative closure, was it an abuse of discretion for the board to deny the request? I wouldn't call it... I believe that the fact that we're here with this petition, and it's all a matter of timing, if you look at this case, and not just this case, but all the cases that came from that period of time between the time when Castretone was decided in 2018 and now, we were horribly affected, without notice, by the actions of the attorney general. We were put in a position where, and I know a lot has been said about administrative closure... Yeah, but so then you're making the argument that Castretone was wrongly decided, and so even if it were valid, we should invalidate it. But putting that aside, let's assume it was valid. I guess my question is just, if that was an interpretation the agency had taken of the governing regulations at the time, and the agency followed it, is it an abuse of discretion? Even if it's not an abuse of discretion, Your Honor, the law has changed. And in this circuit, I would ask the court, in fairness to my client, that the issue as to whether or not you can still pursue this jury... So you said a moment ago in response to Judge Walker that they didn't follow the advocation factors. So as I read matter of advocation, it says the IJ, it's appropriate to consider these various factors in each cases, but they're non-exhaustive, and the IJ needs to exercise independent judgment. And then in this other case, a matter of WYU, it said, well, actually, the most important factor is whether there are good reasons for opposing administrative closure. So is it really a procedural requirement that in every case the agency needs to go through the factors as if it's one by one, or as long as they gave a reason for denying administrative closure, it would satisfy? No, I think they have an obligation to go through the factors. So it's a kind of formalistic requirement that you think they need to recite each factor before denying administrative closure. Well, but Castro-Tum is a did-away with matter of advocation. No, no, I'm saying if it were no matter of Castro-Tum, if it were just matter of advocation, do you read it to say the agency needs to analyze it to tell you the circumstances and give good reasons for denying a request, or do you think that it's a requirement to recite each factor and go through each factor in every case? It's a requirement to recite, but matter of advocation sets out the standard with six factors that have to go back. Well, does it use shall or may? Does it require that the factors, does advocation require that the factors be averted to, or is it satisfactory that they are just suggestions? No, they're not suggestions. It's the standard. There are six factors that are looked at. With matter of validation, it brings advocation back to life. In the record the first time, when the court decided to deny administrative closure, did it refer to Abtesian even though it didn't follow the six factors? It didn't refer to Abtesian, Your Honor. It actually said it referred to Castro-Tum. I know it referred to Castro-Tum, but I'm saying that independently of that. It did not, Your Honor. So Abtesian says, we conclude that when evaluating a request for administrative closure, it is appropriate for an immigration judge or the board to weigh all relevant factors presented in this case, including but not limited to, and then it lists the factors. It's kind of hard to read that as saying you need to go through each factor, especially when there was a subsequent decision that said actually there's one inquiry that's the most important. But if you read matter of Abtesian, and matter of Abtesian is cited in Cruz-Valdez, it lists out the six factors that I would have to satisfy. If the circuit court is sent the case back to the board, I would still have the burden of showing. It's not a one-night reopening. I would have to show the basis of my reason for asking if I have an on-month levy. I need a 601. The likelihood that I could also see, which is extremely high, the anticipated duration of closure, which would be about a year, the responsibility of me causing any delay on not delaying anything. This is a man who came before the government. He wasn't arrested. He doesn't have any criminal records. He surrendered himself. He stepped on his toes trying to seek relief so we would not be delaying anything, and ultimately what would happen is the case goes back. We would satisfy matter of Abtesian. It would be administratively closed on 5 and 6 and 1A. They get through. They're routinely getting through. Even during COVID, say about six months ago, it's all on paper. I have the documents. And then the case would go back to the court. At that point, on my motion to re-calendar, and at that point, the proceedings would be either terminated or the presidency is lost. Can I ask you to describe what would be different if you had to file the I-212? I look at the whole structure of why the 601A was passed, and if you look at the history of the 601A, it was passed because we have a lot of people who are in this country illegally who are eligible to adjust status but for the fact that they entered the country illegally. Having entered the country illegally, they have what's called a three-year or a 10-year bar, most of them have a 10-year bar because if you get older, you're going to have a 10-year bar. Having said that, they could have filed their authority and then they do consular processing outside the United States. A lot of people were extremely afraid of doing that, and the regulations for the 601A did not come about in New York. It took about a decade, maybe 12 years for it to come about. And the whole rationale was to allow a system whereby the person with the admissibility bar would be able to process everything here in the United States. They would get their pass, which is a small piece of paper that said the person was going to be approved, and then they'd go and adjust the bars. Either it was a large person or a client, so it would be Mars, then it would be Mars, and then they would come back to it, so that would be a good period. With the 212, there was not as much, it wasn't passed, it was passed much later, it was amended later. But my belief, representing my clients, is he has a removal order. I am not as confident that he would be able to leave the United States and come back in. That is my reservation. But if you had a 212 approved, wouldn't that be a guarantee that you could? Isn't that the whole point? And you could always be denied. Well, let me go to that point, actually. Is one of your arguments that before obtaining the provisional unlawful presence waiver, if you don't get disclosure, you've got to get an approved I-212, right? Like you have an additional hurdle. Yes, I have an additional hurdle. Which you would not face. No, I have not, no. You would have just gone through the advocation factors. Yes. And then if you had administrative closure, you could go right to the relief you were seeking. Absolutely. But now there is an additional form of relief you would need to seek in the middle, an additional hurdle, and you don't know whether you'll get it or not. You hope you would. You would try for it. But this route is more onerous for your client. Is it as simple as that? It's as simple as that. The only thing I would add here, Andre, is I would have to wait for the BIA to dismiss. I could not file an I-212 until the proceedings. Well, I'm sorry, but the regulation says that you need an administratively final order of removal. Oh, I see. Actually, so there would be a longer process if it went back to the BIA, right, because you'd still have proceedings that weren't administratively final. Is that what you're saying? Either way, it does take a long time, but I would still go back to the BIA. But you agree that if the BIA has concluded its proceedings, you could file for an I-212. I can see that. But if that happens, you're going to have this additional procedure. You've got to file before asking for the thing that you wanted in the first place, right? Yes. And I actually believe that. But wait, just to clarify, you have to follow one of two things. You have to either go back to the BIA and litigate the matter of abstentiation factors to seek administrative closure and get a grant of administrative closure from the BIA, or you need to apply for a form I-212 from USCIS, and they need to approve the application. That's correct. So you could do one or the other. They're both an additional procedure you have to do, right? The adjudication of the abstention standard is something that can be done on paper and is routinely done, and a lot of cases are actually getting remanded back to the board because of this issue. Most of the cases in the other circuits that have dealt with this administrative issue. Yeah, but that's what's interesting. So I don't suppose the government agrees to send it back, but here the government thinks that the BIA had an adequate reason for denying administrative closure, even apart from Castro's own. I still say that we can't ignore. And as to the government, I'll say that on rebuttal, what I'm going to say about the government.  So thank you very much. You have saved two minutes for rebuttal. We kept you here a little longer. Thank you. Why don't we proceed to hear from the government? Do we have them on Zoom? Yes? Yes, Your Honor. And is that Mr. Do we have Mr. Tucker? Yes, I'm here. We don't have your audio yet. No, there's no audio? So I don't know. I'll ask the courtroom deputy, what can we do for audio here? Why don't you try again, Mr. Tucker? How about now? I have unmuted. Beautiful. We can hear you now. Thank you very much. So please proceed. You have ten minutes. Thank you. And may it please the Court, Colin Tucker for the Attorney General. With the matter of Castro's tomb off the table, this case now presents only the straightforward question of whether the board abused its discretion by denying this witness' request for administrative closure. Yeah, and let me just start with a pretty simple question. These are cases that the government has substantial discretion on how to litigate. I'm just curious why you're fighting a remand here. Well, Your Honor, we're fighting a remand here because in cases where the denial of administrative closure is based solely on Castro's tomb, we generally will remand. But here the board identified an alternative reason for why administrative closure was not necessary. See, but I thought that was two different things. One is why they denied administrative closure, which is Castro's tomb, right? And then one was to simply respond to the petitioner's argument of why they needed it. And they said, well, we're denying it for Castro's tomb, and by the way, no harm, no foul, because you really don't need administrative closure to begin with. So I guess I'm not really sure that that was the basis for the BIA's denial so much as a rejection of the argument that you don't need this anyway. Well, Your Honor, I think it's hard to distinguish between the basis for denying administrative closure and identifying the reason why administrative closure is not necessary in an instance where administrative closure is itself a discretionary form of a… Then can I ask you another thing? I wouldn't have thought that under Abtesian the standard was whether administrative closure was necessary. I thought we were supposed to, or the BIA or the IJ were supposed to look at whether there was good reason for it. What were the reasons? And my understanding is that if we project ourselves back in time, had the IJ granted administrative closure, there would have only been one more hoop for the petitioner to jump through, which was the request for a provisional unlawful presence waiver. But had the IJ denied it, as they did, there were two hoops, in your view. First, get your I-212 approved, and then if, and only if, it's approved, then proceed to hoop number two, which is the provisional unlawful presence waiver. So I guess I'm not sure why the standard under Abtesian would have been, this is not necessary, as opposed to, you know, is there a good reason for it, and then weighing the reasons. So that doesn't seem to be a process of weighing that was undertaken by the Board. In other words, I don't see how this alternative holding, if you want to call it that, stands in as a surrogate for an Abtesian finding. Well, there's a few things there, Your Honor. First, I want to point out that the petitioner has up to this point never actually questioned the degree of analysis that the Board engaged in to arrive at its alternative finding. For that reason, I would suggest the argument should be treated as waived. But getting into the merits of it, I agree with you that the matter of Abtesian calls for some consideration of whether there's good reason for administrative closure. And I think here the Board explained why there was no good reason to administratively close. But I guess that's my question. What about the argument that the – I understand that this isn't in Garcia's briefs, but the argument that counsel just made here, which is that the 212 process is more onerous. And so therefore the Board should have considered giving administrative closure as opposed to requiring him to apply for an I-212. Your Honor, I don't think it's at this point at least significantly more onerous because, as has already been pointed out, on remand the petitioner would have to convince the Board that administrative closure is required. So why do we measure the onerousness as of this moment, assuming that there was an error? And that's an assumption that may be incorrect. But if there were error by the Board, why are we measuring the onerousness from this moment? Why are we not measuring the onerousness as of the moment that the BIA made the decision? I mean, if they're the ones who created a situation where it's now equally onerous to go back and fix their mistake, even if it is a mistake only when viewed in hindsight, why is it that we're viewing it from this point currently and not from the point of time when the BIA made its decision? Well, I'm sorry, Your Honor, I shouldn't make clear. I think my answer was based on the belief that there was no error here by the BIA. Sure, and fair enough. But assume for the sake of… And would it have been significantly more onerous to ask Garcia to apply for an I-212 as opposed to getting administrative closure or seeking administrative closure? Well, Your Honor, it would have been an additional step. And at all stages, these steps, whether it be an I-212 or an I-601, are discretionary in nature. So she was not guaranteed to get a 212. She was not guaranteed to have the right to apply for the relief that she would have had the right to directly apply for had she simply gotten administrative closure, right? Look, I think there was no guarantee of a 212, Your Honor, just as there was no guarantee of a 601A being granted either. And there's no guarantee of administrative closure for that matter because it's always discretionary as to whether the IJ or the BIA grant administrative closure, right? That's correct. So we've been talking about this as if it's proper to think about whether the BIA had applied a matter of advocation at the time it was adjudicating this case. But at the time, the attorney general had said that there shouldn't be administrative closure. The agency had determined that administrative closure was not authorized. I know that when we talk about district courts and precedent has been overturned, we usually send it back. But cases like Chevron or Brand X stand for the proposition that the agency has some interpretive discretion. So I guess since we're reviewing this for abuse of discretion, should we say that if at the time of the initial adjudication, the agency was following a matter of clostrotome, which had been promulgated by the attorney general, even though a later attorney general switched positions, was it an abuse of discretion for the BIA to follow it at that time? Your Honor, I think that the very deferential standard of review that's at work here is what effectively carries the day for the government. It's true that the agency did not reference anesthesia in its analysis. We would not have expected the agency to reference that case simply because that case wasn't good law at the time. Right. So would we say that, therefore, it's not an abuse of discretion because they were following what was the agency interpretation at the time? Very much so, Your Honor. Again, the abuse of discretion is a forgiving standard. As long as the decision is not ambiguous and there is a reason to send it forward. Is the department taking the position now that on all these cases that, in effect, if the agency acted appropriately under clostrotome and did not abuse its discretion in denying administrative closure on the basis of clostrotome, that that's the end of the matter? No, Your Honor. There would need to be some alternative holding separate from clostrotome that justifies the denial of administrative closure. For obvious reasons, the agency is no longer directly defending decisions based solely on clostrotome. But that's the policy decision of the Department of Justice. I guess I'm asking about the legal question. I mean, I understand that if, in fact, you agree to a remand, we don't have to decide whether it was an abuse of discretion to follow clostrotome. But since here you're not agreeing to such remand, I guess my question is this. We're faced with the question of whether it was an abuse of discretion for the BIA to follow the attorney general's decision in clostrotome, which was valid at the time, whether that's an abuse of discretion. And it sounds like you're saying that it's not. From a purely legal standpoint, Your Honor, yes, as a matter of policy, the department will and has been remanding cases based solely on clostrotome. From a legal standpoint, does the board, does the immigration judge abuse its discretion by following binding law that was in place at the time it issued its decisions? No, of course not. In fact, when the new attorney general issued Cruz-Valdez, did it purport to be retroactive to prior cases? It's not obvious that it does. We usually presume that it's not retroactive. It did not, Your Honor. That's correct. And so we would be giving it retroactive effect if we say, well, the board abused its discretion by not following advocation at the earlier time when that wasn't good law. Correct, Your Honor. So can I just— Your decision, basically, the department's decision to remand the cases if it was decided solely on the basis of Cruz overruling clostrotome, is just purely a policy matter that stems from the same policy that created Cruz. It's just a department-wide policy. I think that's fair to say, Your Honor, yes. I guess I'm a little confused because I had not understood that that was the government's position here. I thought the government was withdrawing its reliance on clostrotome and was only relying on the second basis. But now I hear you saying something that I think is different, is that you are relying on the fact that clostrotome was in place at the time and that the government as a policy matter is only stipulating to remands in cases where clostrotome was the only basis for its decision. But I think I hear you arguing that, no, you're not withdrawing your argument about clostrotome. And I'm a little confused. I think I'd like if you could just clarify, and maybe it is just what you said, but could you just clarify what is the government's position here? It's a fine distinction, Your Honor, and at this point I strongly suspect that I'm going to want to follow up with a letter to the court that explains it better than I'm doing now. What I can tell you is that I do not believe that the board abuses its discretion when it follows binding law at the time. We are not in this case or others relying on matter of clostrotome to argue. Would you do that maybe, I don't know, within – I don't know, say by Friday noon? Would you file something no more than let's say two pages with the court just clarifying the nature of the government's position on this, whether you are abandoning all reliance on clostrotome as a basis for defending the BIA's decision or whether you are simply saying no, that you adhere to – you do rely on the board's reliance on binding precedent of its own and that it's simply a basis for the government's policy decision not to seek a remand here. I just need to understand. It's not clear to me what the government's position is, the nature of the government's position here. I understand that, Your Honor. A focus on the abuse of discretion standard, whether the BIA abuses its discretion by following something that's a valid – Well, and what the government's position is in terms of are you waiving the argument, which is what I had understood, that you were waiving the argument that there was no abuse of discretion because clostrotome was good law or are you maintaining that that is an argument that you're advancing? Yeah. Two pages max by Friday afternoon, Your Honor. You got it. Oh, yeah. And naturally, if the government, say, files that by – is Friday good, Friday at noon? And then, well, when we hear your adversary stand up on rebuttal in a minute, we'll just ask you, I don't know, say by Wednesday to respond. Would that be – One page is fine, Your Honor, to respond, yes. Again, no more than two pages and – That's fine, and I won't take a lot of the court's time, but I think that the government in this case is speaking out of folks' eyes. Hang on one second. I don't – I'm not sure I have yet – we have yet finished with Mr. Tucker. I'm sorry. I was asking just quickly about timing. Let me just see if the judges have any further questions. We have kept Mr. Tucker a little bit over time. Let me just see if members of the panel have any further questions for Mr. Tucker. No. That's fine. No. Okay. Mr. Tucker, thank you very much for your time. We look forward to hearing from the government. And now, Ms. Andrade, thank you very much. You have reserved two minutes for rebuttal. I am totally surprised by the government's argument today because it was put in writing. He advised the court that murder of Pastor Trump is no longer good law and that it doesn't justify the denial of administrative authority in this case. So I welcome the opportunity to respond right into whatever he has to. Robert, I'm sure you can appreciate the idea that the agency sometimes changes its interpretation of the governing statutes and regulations. And so the question is whether the agency has abused its discretion when it relies on something that was valid at the time it was adjudicated. Well, I would go to the point about the fact that Attorney General Garland, in his decision of Cruz Chavez, did not say whether or not it was retroactive or not. But there— He didn't say it. And so usually when he doesn't say it, we assume that it's not retroactive, right? It's not clear, though. It's not stated, Your Honor. I would say that it is. I would say that due process is required for it to be retroactive. A completely different interpretation of a statute comes with different results. Well, usually we say that due process, when you change the interpretation of a statute that governs an adjudication like this, we say due process requires it to apply only prospectively. The due process interest generally says it should not be applied retroactively. I disagree. I think that he's being treated differently if the government does not apply the law of the land. And we are here in this circuit with a live case, with a live claim regarding the fact that it should apply to him. I could address that in the written—in response to what he's saying. Why don't we just leave it for now, that each of you will submit two pages. We'll hear from the government to clarify what their—the nature of their position is. That will give you two pages to respond. I think at that point, if the Court requires any supplemental briefing, we'll simply direct the parties to do so. So thank you both very much for a very informative and helpful oral argument. We will reserve decision. Thank you very much.